UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GARY C. MARCINKOWSKI,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                        14-CV-809S
CITY OF BUFFALO, DANIEL KURDZIEL,
and JOSHUA CRAIG,

                    Defendants.


# I. INTRODUCTION

In this action, Plaintiff Gary C. Marcinkowski asserts a number of federal and state claims arising from a physical encounter he had with Defendants Daniel Kurdziel and Joshua Craig, two Buffalo police officers, in September 2013. Presently before this Court are the parties' cross motions for summary judgment. (Docket Nos. 51, 57.) For the reasons that follow, Marcinkowski's motion is denied, and Defendants' motion is granted in part and denied in part.

# II. BACKGROUND

It is undisputed that in the early morning hours of September 29, 2013, Marcinkowski was involved in a physical altercation with Kurdziel and Craig at Mercy Hospital of Buffalo. The parties dispute the nature and circumstances of this incident but agree that it resulted in Kurdziel and Craig forcibly restraining Marcinkowski, which was partially captured on video. The parties' versions of this incident and a description of the video are set forth below.

1

## A. Marcinkowski's Version

Late on September 28, 2013, Marcinkowski rode his motorcycle to Mercy Hospital of Buffalo after a dispute with his girlfriend caused him anxiety. (Deposition of Gary C. Marcinkowski ("Marcinkowski Dep."), Docket No. 57-6, pp. 17-19, 28.) He presented to the nurses' station in the emergency department and was eventually placed in an examination room. (Marcinkowski Dep., pp. 23-26.) Marcinkowski hoped to speak with someone about his anxiety, but never expressed to any hospital staff that he was suicidal. (Marcinkowski Dep., p. 28.) He had with him his motorcycle helmet, medications, cash, and identification. (Marcinkowski Dep., p. 25.)

Three staff members accompanied Marcinkowski to the examination room. (Marcinkowski Dep., p. 26.) Marcinkowski asked that his medication and cash be counted and inventoried, in case he was separated from his property. (Marcinkowski Dep., pp. 27, 30.) Hospital staff satisfied this request and documented Marcinkowski's anxiety medication and almost $8,000 in cash. (Marcinkowski Dep., p. 30.) This did not include a smaller amount of "personal cash" that Marcinkowski kept with him in his pocket. (Marcinkowski Dep., p. 30.)

After this initial intake, Marcinkowski provided a urine sample, took a breathalyzer test, and then waited in the examination room accompanied by a hospital staff member for more than six hours before deciding that he wanted to leave. (Marcinkowski Dep., pp. 34, 38.) Marcinkowski told both the staff member in the room and a nurse that he wanted to leave. (Marcinkowski Dep., p. 34.) They told him that a doctor was on the way, but Marcinkowski insisted on leaving because he had already been waiting for six

hours.   (Marcinkowski Dep., pp. 36-37.)   The staff member and nurse then left Marcinkowski alone in the examination room and shut the door.   (Marcinkowski Dep., p. 37.)  Marcinkowski admits that he began to get upset because hospital staff would not let him leave, but he denies ever using threatening language or threatening anyone with his motorcycle helmet.   (Marcinkowski Dep., p. 37-39.)

About 20 or 30 minutes after the nurse and staff member left Marcinkowski, Defendants Kurdziel and Craig arrived.   (Marcinkowski Dep., p. 38.)   Marcinkowski did not know that the police had been called; he saw them for the first time through the window in the examination room door.   (Marcinkowski Dep., pp. 40-41.)

Within 10 seconds of Marcinkowski seeing Kurdziel and Craig, they entered his room.   (Marcinkowski Dep., pp. 42.)   Marcinkowski held his motorcycle helmet in his right hand, as he had been since he started asking to leave the hospital.   (Marcinkowski Dep., pp. 43, 44.)   Four seconds after opening the door, Kurdziel and Craig "slid their batons out and they just start beating [Marcinkowski] with the batons until they flipped [Marcinkowski] over the exam table . . . At that point [Marcinkowski] was covering [his] head and the one patrolman hit [him] three times hard enough in the elbow to break [his] elbow."  (Marcinkowski Dep., pp. 45-46, 48, 49.)   Marcinkowski dropped his motorcycle helmet and covered his head with both arms.   (Marcinkowski Dep., pp. 46-47, 48, 50.) He does not recall whether the officers said anything to him.   (Marcinkowski Dep., pp. 44, 48, 54.)

After Marcinkowski was on the ground, and after his elbow had been injured, Kurdziel and Craig laughed at him, and one of them said, "let's pepper spray him."

(Marcinkowski Dep., p. 51.)   They then pepper-sprayed and handcuffed Marcinkowski, who afterwards asked for "nitro medicine" because he was experiencing chest pain.[1] (Marcinkowski Dep., pp. 51, 53, 55, 64-65.)   Marcinkowski never resisted the officers in any way throughout the encounter.   (Marcinkowski Dep., p. 53.)

After Marcinkowski was handcuffed, Kurdziel and Craig escorted him out of the room to their patrol car.   (Marcinkowski Dep., pp. 55-57, 60.)   On the way out, Marcinkowski hit several door frames and kept passing out.   (Marcinkowski Dep., pp. 55-57, 59, 60.)

Once outside, Kurdziel and Craig "stuffed" Marcinkowski into the backseat of the patrol car, during which Marcinkowski hit his head on the car door frame.   (Marcinkowski Dep., p. 60.)   Marcinkowski was unconscious when the officers drove away from the hospital.   (Marcinkowski Dep., p. 62.)   The next thing Marcinkowski recalls is someone opening the car door, placing his or her hand on his shoulder, and punching him in the face, breaking his nose and again knocking him unconscious.   (Marcinkowski Dep., pp. 62, 63.)   He does not know where this occurred but thinks it was in a dimly lit parking lot. (Marcinkowski Dep., pp. 62, 64, 65.)   Marcinkowski next remembers an ambulance responding to the scene and taking him to the Erie County Medical Center ("ECMC"). (Marcinkowski Dep., pp. 64, 65.)   He does not recall whether he complained of chest pain while in the patrol car.   (Marcinkowski Dep., p. 65.)

At ECMC, Marcinkowski was admitted for both physical and psychiatric care and remained for five or six days.   (Marcinkowski Dep., pp. 66-69.)   Marcinkowski contends

---

[1] Marcinkowski had suffered a heart attack just two weeks before this incident.   (Marcinkowski Dep., p. 11.)

that his encounter with Kurdziel and Craig left him with a broken left elbow with a 1-inch cut in it, a broken nose, two herniated discs in his neck, and bruising all over his body. (Marcinkowski Dep., p. 16.)   He also claims that he now experiences increased anxiety in the company of law enforcement officers.   (Marcinkowski Dep., p. 29.)

### B. Defendants' Version

Defendants Kurdziel and Craig were dispatched to Mercy Hospital on September 29, 2013, between 5:21 and 5:27 a.m., after someone from the hospital called 911 to report threats and harassment.   (Deposition of Daniel Kurdziel ("Kurdziel Dep."), Docket No. 51-5, pp. 19, 23-24, 27; Deposition of Joshua Craig ("Craig Dep."), Docket No. 51-6, pp. 14, 15, 16.)   The call received from Mercy Hospital was summarized as "47-year-old male in emergency room 13 threatening staff with his motorcycle helmet, was having suicidal thoughts, no other weapons seen."   (Kurdziel Dep., p. 26; Craig Dep., pp. 15-16.)

When Kurdziel arrived at Mercy Hospital, he first spoke to staff in the emergency department.   (Kurdziel Dep., pp. 24-25.)   Kurdziel was told that Marcinkowski had become violent with the staff, was using his motorcycle helmet as a weapon, and had refused staff requests to drop his motorcycle helmet.   (Kurdziel Dep., p. 25.)   Staff also told Kurdziel that they had Marcinkowski confined in an examination room.   (Kurdziel Dep., p. 25.)   No one was guarding the room, though hospital staff had it under observation.   (Kurdziel Dep., p. 29.)

Craig arrived on the scene after Kurdziel and remembers seeing an Officer Kline in the vicinity as well.   (Craig Dep., pp. 17, 44.)   Craig immediately went to the

emergency department to backup Kurdziel, who was standing just outside Marcinkowski's room. (Kurdziel Dep., pp. 29, 39; Craig Dep., pp. 17-19.) When Kurdziel and Craig entered the room, Marcinkowski was holding his motorcycle helmet. (Kurdziel Dep., p. 30; Craig Dep., p. 20.) Kurdziel does not recall what Marcinkowski said when they entered the room, but Marcinkowski was using profanity and was agitated. (Kurdziel Dep., pp. 31, 34, 41.) Craig recalled Marcinkowski standing in a very aggressive, combative posture, as if ready to engage in a physical altercation. (Craig Dep., p. 20.) Craig felt threatened because of Marcinkowski's size and possession of his motorcycle helmet, which Craig considered to be an impact weapon. (Craig Dep., pp. 20, 22.)

Kurdziel instructed Marcinkowski to drop his helmet several times, but Marcinkowski refused to comply. (Kurdziel Dep., pp. 30, 31, 34, 102; Craig Dep., pp. 22, 33, 35.) Kurdziel wanted Marcinkowski to drop his helmet because of the reports from hospital staff that he had previously been swinging it in a threatening manner. (Kurdziel Dep., pp. 31, 102.) Craig recalls Kurdziel reaching for Marcinkowski's helmet to try to get it away from him. (Craig Dep., p. 61.) Soon thereafter, Marcinkowski swung his helmet at Kurdziel, at which point Kurdziel deployed his black collapsible baton.[2] (Kurdziel Dep., p. 34; Craig Dep., p. 35.) Kurdziel and Craig then moved in on Marcinkowski to disarm him of the helmet, with Kurdziel striking Marcinkowski on the arm with his baton. (Kurdziel Dep., pp. 34, 40, 102; Craig Dep., pp. 23-24, 25-26.) Craig also recalls striking Marcinkowski in the extremities with his baton. (Craig Dep., pp. 25,

---

[2] Kurdziel described his collapsible baton as follows: "They're made of metal. They consist of a blue three-part segmented body that is activated by gravity inertia. Approximate weight is about half a pound if I had to guess and it is stored on our belt." (Kurdziel Dep., p. 39.)

26, 70.)   Marcinkowski continued to fight with Kurdziel and Craig even after they deployed their batons.   (Craig Dep., p. 27.)

Kurdziel and Craig struggled with Marcinkowski "all over the room," as he violently resisted them.   (Kurdziel Dep., p. 35; Craig Dep., pp. 24, 44.)   Craig described it as "an intense struggle," and recalls all three men "going over the bed."   (Craig Dep., pp. 23, 26.)   Kurdziel recalls Craig spraying Marcinkowski with chemical spray from six or seven feet away, which allowed them to subdue and handcuff him.   (Kurdziel Dep., pp. 35, 36, 76, 99, 102; Craig Dep., pp. 24, 26, 27, 28, 36, 44-45, 59.)   Craig does not recall whether he or Kurdziel deployed the chemical spray, but he recalls that it was used to subdue Marcinkowski.   (Craig Dep., pp. 25, 60.)   Craig stated that neither he nor Kurdziel struck Marcinkowski with their batons after the chemical spray proved effective.   (Craig Dep., p. 27.)

Once Marcinkowski was handcuffed, Kurdziel and Craig got him into a seated position to calm him down and have hospital staff treat him.   (Kurdziel Dep., pp. 35, 59-60.)   Craig also decontaminated Marcinkowski by applying a wet towel to his face. (Craig Dep., p. 36.)   Marcinkowski was not under arrest; he was handcuffed for control. (Kurdziel Dep., p. 35.)   Kurdziel does not recall if Marcinkowski complained of any physical injuries or eye irritation.   (Kurdziel Dep., pp. 36, 59.)   Kurdziel and Craig tried to talk to Marcinkowski, but he was not responsive.   (Kurdziel Dep., p. 43.)   They then determined, in conjunction with Mercy Hospital staff, that there existed cause under Public Health Law 9-41 to take Marcinkowski to Erie County Medical Center ("ECMC") for a mental-health evaluation, particularly because he expressed suicidal thoughts.   (Kurdziel

Dep., pp. 43-45, 53; Craig Dep., p. 39.)

Kurdziel believes that he and Craig likely escorted Marcinkowski out of the hospital and placed him in Craig's patrol car, though he does not specifically remember escorting Marcinkowski out, nor does Craig.   (Kurdziel Dep., pp. 53-54, 63, 64, 113; Craig Dep., p. 47.)   Marcinkowski had visible bruising and redness at that time.   (Kurdziel Dep., p. 80; Craig Dep., p. 67.)   This occurred at 5:41 a.m.   (Kurdziel Dep., pp. 60, 64.)   But just one minute later, Marcinkowski became combative in the back of the patrol car, which caused Craig to change his destination from ECMC to the station house, likely at Kurdziel's direction.   (Kurdziel Dep., pp. 66-67, 71; Craig Dep., pp. 41, 42.)   At 5:49 a.m., Marcinkowski complained of chest pains, so Craig called for an ambulance to respond to the station house.   (Kurdziel Dep., pp. 66-68, 71.)   Craig, however, does not recall Marcinkowski complaining of chest pain, either at Mercy Hospital or on the way to or at the station house.   (Craig, Dep., p. 51.)   Kurdziel denies that Marcinkowski was ever struck while in the back seat of the patrol car.   (Kurdziel Dep., p. 113.)

According to Kurdziel, Craig drove Marcinkowski to the station house, where they were met in the parking lot by an ambulance.   (Kurdziel Dep., pp. 77-78.)   Craig does not recall whether he drove Marcinkowski to the station but remembers being there with Marcinkowski.   (Craig Dep., pp. 49, 51, 53.)   Craig went into the station to retrieve use-of-force reports for himself and Kurdziel, while Kurdziel spoke to the ambulance crew near the patrol car carrying Marcinkowski.   (Craig Dep., pp. 50, 53.)   Neither Kurdziel nor Craig recalls Marcinkowski ever losing consciousness while in their presence.   (Kurdziel Dep., p. 79; Craig Dep., p. 37.)

At 6:15 a.m., Kurdziel notified dispatch that he was going to ECMC. (Kurdziel Dep., p. 73.) He followed the ambulance that was transporting Marcinkowski to ECMC in case Marcinkowski became agitated again. (Kurdziel Dep., pp. 73, 76, 104, 106.) Kurdziel believes that he was the only officer following the ambulance. (Kurdziel Dep., p. 107.) After the ambulance driver informed Kurdziel that Marcinkowski had calmed down and that the ambulance staff could handle the situation, Kurdziel left ECMC at 7:05 a.m. to return to the station house. (Kurdziel Dep., pp. 75-76, 106.)

Marcinkowski was never arrested. (Kurdziel Dep., p. 57.)

## C. The Video

A partial surveillance video of Marcinkowski's encounter with Kurdziel and Craig is manually filed in the record. (Docket No. 55.) The video is approximately seven minutes long, running from 5:19:01 to 5:25:59 a.m. It is shot at ceiling height from the corner of the examination room where Marcinkowski was placed by hospital staff. The door, with a large window, and the entirety of the room are visible. There is no audio.

The video begins with Marcinkowski standing and facing the open door, holding his motorcycle helmet in his right hand as he sways back and forth from side to side. At 5:19:31, staff close the door as Marcinkowski continues to sway. Ten seconds later, Marcinkowski begins talking through the window of the door and making gestures of impatience: raising his arms at his sides and dropping them; pointing; pacing.

At 5:20:18, it appears that Marcinkowski rips off his hospital bracelet and throws it on the floor. He then resumes gesturing and pacing frontward and backward toward the door, still holding his helmet in his right hand. He also appears to be speaking through

the window, but it is difficult to tell for certain.

At 5:22:35, it appears that Marcinkowski unsuccessfully tries to open the door. He then stands at the window and appears to be speaking to someone. He remains standing and talking at the door until 5:23:27, when he backs away from the window into the room, still swaying and holding the helmet.

At 5:24:19, someone comes to the door holding what appears to be paperwork, which Marcinkowski appears to review through the window for a few seconds. He then backs away, again gesturing with his arms.

At 5:25:20, the door opens and two officers appear, presumably Kurdziel and Craig. Marcinkowski stands about three feet away from the door as they enter and does not move back as they come in. Each officer already has a baton in his hand.

At 5:25:24, the first officer who entered reaches for Marcinkowski's helmet, which Marcinkowski tucks behind his back. The first officer than takes a step to the side and grabs for the helmet again, at which point the second officer also tries to subdue Marcinkowski. The two officers push Marcinkowski back onto the examination bed. Marcinkowski continues to grasp his helmet as the officers try to get it away from him. It appears that each officer strikes Marcinkowski with his baton multiple times as Marcinkowski continues to struggle. The video then abruptly ends mid-struggle.

### III. DISCUSSION

Marcinkowski asserts eight claims arising out of his interaction with Kurdziel and Craig, two federal claims and six state claims. The federal claims, brought under 42 U.S.C. § 1983 against each named defendant, fall under the Fourth Amendment: false

arrest (first claim) and excessive force (second claim).   The next three claims, all state claims brought against each named defendant, allege false imprisonment (third claim), assault (fourth claim), and battery (fifth claim).   Marcinkowski then asserts two claims against only Kurdziel and Craig: intentional and negligent infliction of emotional distress (sixth and seventh claims).   The final claim is against only the City of Buffalo: negligent training and supervision (eighth claim).

As discussed below, Defendants move for summary judgment on each claim.

## A.  General Legal Principles

### 1.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).   A fact is "material" if it "might affect the outcome of the suit under the governing law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).   An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."   Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).   "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."   Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).   Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the

opposing party, summary judgment is improper." <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. <u>Anderson</u>, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," <u>D'Amico v. City of N.Y.</u>, 132 F.3d 145, 49 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. <u>Anderson</u>, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996).

This same standard applies to cross motions for summary judgment. <u>See Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." <u>Id.</u> (citing <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993); <u>Schwabenbauer v. Bd. of Educ.</u>, 667

12

F.2d 305, 314 (2d Cir. 1981)).

## 2. Section 1983 and Personal Involvement

Marcinkowski brings his two federal claims under 42 U.S.C. § 1983. Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must establish that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); see also Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also

13

Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Personal involvement need not be active participation. It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

### 3. Statute of Limitations

The statute of limitations for a § 1983 claim is "that which the State provides for personal-injury torts." Wallace v. Kato, 549 U.S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007). In New York, that statute of limitations is three years. See Berman v. Perez, No. 17-CV-2757 (JGK), 2018 WL 565269, at *2 (S.D.N.Y. Jan. 24, 2018) (citing Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013), in turn citing N.Y. C.P.L.R. § 214).

Marcinkowski filed his complaint on September 26, 2014. (Docket No. 1.) Consequently, any claims pre-dating September 26, 2011, which there are none, would

14

be time-barred.

## B. Marcinkowski's Claims

### 1. Fourth Amendment False Arrest (Claim 1)
### False Imprisonment (Claim 3)

A false arrest claim brought under § 1983 and premised on the Fourth Amendment right to be free from unreasonable seizure is analyzed the same as a claim for false arrest/false imprisonment brought under New York law.  See Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  The two claims are essentially synonymous.  See Weyant, 101 F.3d at 853 (citing Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)); Nix v. City of Rochester, No. 6:14-CV-06395 (MAT), 2017 WL 3387103, at *5 (W.D.N.Y. Aug. 5, 2017).

To succeed on a false arrest/false imprisonment claim, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.  See Willey v. Kirkpatrick, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting Broughton v. State of New York, 335 N.Ed.2d 310, 314 (N.Y. 1975)); Nix, 2017 WL 3387103, at *5.

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity."  Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015); Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Walker v. City of New York, 15 CV 500 (NG)(ST), 2017 WL 2799159, at *3 (E.D.N.Y. June 27, 2017) ("An arrest is privileged when probable cause exists, and probable cause is, therefore, a

15

complete defense to a claim for false arrest.") (citing <u>Weyant</u>).

Probable cause "is a complete defense to an action for false arrest brought under New York law or § 1983." <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012). A finding of probable cause is made based on the "totality of the circumstances." <u>Illinois v. Gates</u>, 462 U.S 213, 230, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1982). An officer has probable cause to arrest or detain "'when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" <u>Garcia v. Does</u>, 779 F.3d 84, 92 (2d Cir. 2015) (quoting <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 751 (2d Cir. 2010)). In assessing probable cause, an officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 70 (2d Cir. 2001) (internal quotation marks omitted). When a victim or eyewitness reports a crime, probable cause will generally be found to exist, unless the circumstances raise doubt as to the veracity of the complaint. <u>See</u> <u>Fabrikant v. French</u>, 691 F.3d 193, 216 (2d Cir. 2012); <u>Wahhab v. City of New York</u>, 386 F. Supp. 2d 277, 287 (S.D.N.Y. 2005).

Under New York Mental Hygiene Law § 9.41, a police officer may take into custody and deliver to a suitable hospital or psychiatric facility any person who appears to be mentally ill and is conducting himself in a manner likely to result in serious harm to himself or others. The statute defines "likely to result in serious harm" as "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to

himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."   N.Y. Mental Hygiene Law, § 9.01.

Here, several undisputed facts demonstrate that Kurdziel and Craig had sufficient probable cause to take Marcinkowski into custody under § 9.41 of the Mental Hygiene Law.   First, Mercy Hospital staff called 911 and reported that they had a patient with suicidal ideations that was threatening them with a motorcycle helmet.   (Transcript of 911 Call, Docket No. 57-7, p. 1.)   Second, Kurdziel and Craig were dispatched to Mercy Hospital to respond to this call and told that a "47-year-old male in emergency room 13 [was] threatening staff with his motorcycle helmet, was having suicidal thoughts, no other weapons seen."   (Defendants' Statement of Undisputed Facts ("Defendants' Statement"), Docket No. 51-1, ¶¶ 10, 11; Plaintiff's Statement of Material Facts ("Plaintiff's Statement"), Docket No. 57-2, ¶¶ 10, 11; Kurdziel Dep., p. 26; Craig Dep., pp. 15-16.) Third, this information was confirmed when Kurdziel and Craig arrived on the scene, spoke to hospital staff, and found Marcinkowski in an examination room holding his helmet.   (Defendants' Statement, ¶ 16; Plaintiff's Statement, ¶ 16.)

Based on the totality of these undisputed circumstances, this Court finds that Kurdziel and Craig had sufficient probable cause to detain Marcinkowski under § 9.41. As Kurdziel and Craig understood it, Marcinkowski had both expressed suicidal thoughts and threatened staff with his motorcycle helmet.   This information was reported by eyewitnesses and confirmed on the scene.   There was thus sufficient probable cause for Kurdziel and Craig to believe that Marcinkowski posed a substantial risk of physical harm

17

to himself and that he instilled a reasonable fear of serious physical harm in others. See N.Y. Mental Hygiene Law, § 9.01. Because the existence of probable cause is a complete defense, Kurdziel and Craig are entitled to summary judgment on these claims.

But even if probable cause could be found to be lacking, Kurdziel and Craig would still be entitled to summary judgment based on qualified immunity. "Qualified immunity protects public officials from civil liability 'if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015) (quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)); White v. Pauly, __ U.S. __, 137 S. Ct. 548, 551, 196 L Ed. 2d 463 (2017) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, __ U.S. __, 136 S. Ct. 305, 307, 193 L. Ed. 2d 255 (2015) (per curiam) (quoting Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)). Clearly established law should not be defined "at a high level of generality." White, 137 S. Ct. at 552. Although the caselaw "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or

18

constitutional question beyond debate." <u>Id.</u> at 551 (alteration omitted) (internal quotation marks omitted).

Here, there is no doubt that the right to be free from seizure without probable cause was clearly established at the time Kurdziel and Craig took Marcinkowski into custody. <u>See</u> <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000) (collecting cases). The entitlement to qualified immunity therefore turns on whether Kurdziel and Craig's probable cause determination was objectively reasonable. In this regard, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met." <u>Jenkins v. City of New York</u>, 478 F.3d 76, 86 (2d Cir. 2007 (quoting <u>Lennon v. Miller</u>, 66 F.3d 416, 423-24 (2d Cir. 1995)). The essential inquiry is whether it was objectively reasonable for the officer to conclude that probable cause existed. <u>See</u> <u>id.</u> Based on the totality of undisputed circumstances set forth above, this standard is easily met. Consequently, Kurdziel and Craig would be entitled to summary judgment on this basis as well.

### 2. Fourth Amendment Excessive Force (Claim 2)
### Assault (Claim 4)
### Battery (Claim 5)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Excessive force claims arising from an arrest, investigatory stop, or other seizure of a free citizen are analyzed under the Fourth Amendment, which applies to the States by way of the Fourteenth Amendment. <u>Graham v. Connor</u>, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L.

Ed. 2d 443 (1989) (holding that the Fourth Amendment, not the Fourteenth Amendment, governs excessive force claims involving arrest "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct"); Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L. Ed. 2d 334 (1993).

Fourth Amendment excessive force claims are analyzed under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene, with recognition that law enforcement officers must often make split-second judgments under tense, uncertain, and rapidly evolving circumstances when deciding whether to use force. Graham, 490 U.S. at 394, 396; Piper v. City of Elmira, 12 F. Supp. 3d 577, 587 (W.D.N.Y. 2014). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' . . . violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

At bottom, the inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (citing Scott v. United States, 436 U.S. 128, 137-139, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978)); Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006). In other words, evil intentions do not transform an objectively reasonable use of force into a constitutional violation, just as good intentions do not make an objectively unreasonable use of force constitutional. Id.

It is well settled that the right to make a lawful arrest carries with it the right to employ reasonable force to effectuate that arrest. Graham, 490 U.S. at 396. An officer

is therefore justified in using force when a person whom he is trying to arrest resists, threatens, or assaults the officer.  Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000).  But "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."  Id.  Factors to be considered in determining the reasonableness of the force used include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting or attempting to flee.  See Graham, 490 U.S. at 396; Outlaw v. City of Hartford, 884 F.3d 351, 366 (2d Cir. 2018); Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).

As set out above, the circumstances under which Kurdziel and Craig used force against Marcinkowski are heavily disputed.  According to Marcinkowski, Kurdziel and Craig stormed the examination room and, in a completely unprovoked attack, immediately began beating him with their batons without ever speaking to him.   They flipped him over the exam table and continued beating him after he fell to the ground.   They then needlessly spayed him with chemical spray before securing him in handcuffs.   Kurdziel and Craig then bounced Marcinkowski off of door frames on their way out of the hospital before "stuffing" him in a patrol car and later punching him in the face, breaking his nose. This all allegedly occurred without Marcinkowski ever resisting or physically engaging the officers.

Yet according to Kurdziel and Craig, Marcinkowski was combative, aggressive, and would not yield to their authority.   He refused their commands, swung his motorcycle

21

helmet at them, and violently resisted. To gain control, Kurdziel and Craig deployed their batons and chemical spray only until such time as they could subdue Marcinkowski, after which they immediately had him treated by medical staff. They deny any further physical interaction with Marcinkowski, including walking him into door frames and punching him in the face.

Given these diametrically opposed versions of events, no party is entitled to summary judgment. A jury must weigh the evidence and resolve the disputed issues of material fact. A jury crediting Marcinkowski's account could reasonably find that Kurdziel and Craig used excessive force in violation of the Fourth Amendment. So too, a jury crediting Defendants' account could reasonably find that the amount of force used was objectively reasonable under the circumstances. Summary judgment is therefore precluded. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) ("granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable"); Robinson v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (finding that a jury, not the court on summary judgment, must resolve credibility conflicts and choose between conflicting versions of events); Lin v. Cty. of Monroe, 66 F. Supp. 3d 341, 360 (W.D.N.Y. 2014) (denying summary judgment because "there are disputed issues of material fact regarding the extent to which Plaintiff continued to be uncooperative during his arrest, and whether the deputies' use of force was reasonable under the circumstances").

For the same reasons, summary judgment is precluded on Marcinkowski's state

law assault and battery claims because "'[e]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical.'" Greene v. City of New York, 15-CV-6436 (NGG)(CLP), 2019 WL 3606739, at *15 (E.D.N.Y. Aug. 6, 2019) (quoting Humphrey v. Landers, 344 F.App'x 686, 688 (2d Cir. 2009)); see also Graham v. City of New York, 928 F. Supp. 2d 610, 625 (E.D.N.Y. 2013) ("Since there are questions of fact regarding [the plaintiff's] excessive force claim, there are also questions of fact regarding [the plaintiff's] state law assault and battery claims against Defendant."); Li v. United States, No. 05 Civ. 6237 (NRB), 2009 WL 3321014, at *1 n.2 (S.D.N.Y. Oct. 8, 2009) ("As against law enforcement personnel, assault and battery claims under New York law parallel the Fourth Amendment standard governing the use of force incident to a lawful arrest.").

Defendants again maintain that even if their use of force is not found to be objectively reasonable, they are entitled to summary judgment on qualified immunity grounds. But where, as here, "the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." Mickle v. Morin, 297 F.3d 114, 122 (2d Cir. 2002). This is because the reasonableness of an officer's conduct is at issue in both the substantive Fourth Amendment analysis and the second portion of the qualified immunity analysis. See Benson v. Yaeger, No. 05-CV-784S, 2009 WL 1584324, at *6 (W.D.N.Y. June 3, 2009) (citing Cowan v. Breen, 352 F.3d 756, 764 (2d Cir. 2003)). Consequently, when

disputed issues of material fact exist as to the reasonableness of the force used, summary judgment on qualified immunity grounds is precluded.  See Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999); Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 263 (N.D.N.Y. Aug. 13, 2014).

### 3. Intentional Infliction of Emotional Distress (Claim 6)
### Negligent Infliction of Emotional Distress (Claim 7)

In New York "a person may not bring claims for intentional infliction of emotional distress or negligent infliction of emotional distress where, as here, there are more traditional theories of tort liability available."  Hays v. City of New York, 14-CV-10126 (JMF), 2017 WL 782496, at *5 (S.D.N.Y. Feb. 28, 2017) (citing cases).  That is, "New York does not recognize [intentional-infliction-of-emotional-distress] or [negligent-infliction-of-emotional-distress] causes of action where the conduct underlying them may be addressed through traditional tort remedies, such as false arrest."  Berrio v. City of New York, 15-CV-09570 (ALC), 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017).  Thus, emotional distress claims may "be invoked only as a last resort."  Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158-160 (2d Cir. 2014).

Here, Marcinkowski's emotional distress claims involve the same conduct that underlies his excessive force, assault, and battery claims.  Because alternate remedies are available, Marcinkowski's emotional distress claims must be dismissed.  See Greene, 2019 WL 3606739, at *16-17 (dismissing emotional distress claims where other tort claims remain, including excessive force, assault, and battery); Jones v. Parmley, 5: 98-CV-374 (FJS/TWD), 2016 WL 5793711, at *1 (N.D.N.Y. Oct. 4, 2016) (collecting cases standing for the proposition that emotional distress claims do not survive when other

remedies remain available).

### 4. Negligent Training and Supervision (Claim 8)

"To maintain a claim against a municipal employer for the 'negligent hiring, training, and retention' of a tortfeasor under New York law, a plaintiff must show that the employee acted 'outside the scope of her employment.'" Velez v. City of New York, 730 F.3d 128, 136-37 (2d Cir. 2013) (quoting Gurevich v. City of New York, No. 06 Civ. 1646 (GEL), 2008 WL 113775, at *6 (S.D.N.Y. Jan. 10, 2008)).  If an employee acts within the scope of his employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of *respondeat superior*. Id. at 137.  "This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the . . . adequacy of the training." Karoon v. N.Y.C. Transit Auth., 241 A.D.2d 323, 659 N.Y.S.2d 27, 29 (1st Dep't 1997).

To state a claim for negligent hiring, training, and supervision, a plaintiff must allege, in addition to the elements of standard negligence, that "(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam).

"'A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of

facts that would lead a reasonably prudent person to investigate that prospective employee.'" Bouchard v. N.Y. Archdiocese, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (quoting Richardson v. City of New York, No. 04 Civ. 05314 (THK), 2006 WL 3771115, at *13 (S.D.N.Y. Dec. 21, 2006)); Tesoriero v. Syosset Cent. Sch. Dist., 382 F. Supp. 2d 387, 401 (E.D.N.Y. 2005) ("to prevail on a negligent hiring, retention, or supervision claim under New York law, the plaintiff must show that the defendant/employer knew or should have known of its employee's propensity to engage in the injurious conduct in question"). And "a single incident is generally insufficient to demonstrate liability under a failure to train theory" or a failure-to-supervise theory. Breitkopf v. Gentile, 41 F. Supp. 3d 220, 254 (E.D.N.Y. 2014) (quoting Perez v. N.Y.C. Dep't of Corr., No. 10-CV-2697 RRM RML, 2013 WL 500448 (E.D.N.Y. Jan. 17, 2013)); White-Ruiz v. City of New York, No. 93 CIV. 7233 (DLC)(MHD), 1996 WL 603983, at *10 (S.D.N.Y. Oct. 22, 1996).

Here, Marcinkowski identifies no evidence whatsoever showing that the City of Buffalo knew or should have known of Kurdziel and Craig's alleged tendency to violate individuals' constitutional rights. The only argument he makes in this regard is that "[a] question of fact exists as to the policies[3] of Defendant City of Buffalo and its training of its police officers" based on the "extensive" questioning of the officers' training during their depositions. (Plaintiff's Memorandum of Law, Docket No. 57-1, p. 11.) But Marcinkowski does not identify any specific evidence that supports his claim, nor does he

---

3 To the extent Marcinkowski asserts a § 1983 Monell municipal liability claim, he has similarly not identified or set forth any evidence of a policy or custom that caused his injury or any evidence of a causal relationship between that policy and his alleged injuries. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). The City of Buffalo is therefore entitled to summary judgment on any Monell claim as well.

identify any specific questions of fact or deficiencies concerning the officers' training.   In the absence of any such evidence, the City of Buffalo is entitled to summary judgment.[4] See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. CONCLUSION

Due to the existence of disputed issues of material fact, a jury must resolve whether Kurdziel and Craig used excessive force against Marcinkowski on September 29, 2013.   Neither side is therefore entitled to summary judgment on Marcinkowski's Fourth Amendment excessive force claim (Claim 2), state law assault claim (Claim 4), or state law battery claim (Claim 5).   But for the reasons stated above, Defendants are entitled to dismissal or summary judgment on Marcinkowski's five other claims: false arrest; false imprisonment; intentional infliction of emotional distress; negligent infliction of emotional distress; and negligent training and supervision.   Consequently, Marcinkowski's motion for summary judgment is denied, and Defendants' motion for summary judgment is denied in part and granted in part.   Before proceeding to trial, the parties shall engage in mediation to determine whether a pretrial resolution of this matter can be reached.

---

4 To the extent Marcinkowski believes that this Court will accept his general argument as an invitation to mine the record in search of relevant evidence, he is mistaken.   This Court has no obligation to do so. See Amnesty Am. v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002) ("[Rule 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); Smith v. Ward Leonard Elec. Co., Inc., No. 00 Civ. 3703, 2004 WL 1661098, at *3 n.2 (S.D.N.Y. July 23, 2004) ("It is the job of Plaintiff's counsel, not the Court, to identify evidence sufficient to avoid summary judgment.")

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiff's motion for summary judgment (Docket No. 57) is DENIED.

FURTHER, that Defendants' motion for summary judgment (Docket No. 51) is GRANTED in part and DENIED in part, consistent with this decision.

FURTHER, that this case is REFERRED for alternative dispute resolution under Section 2.1.B of the Plan for Alternative Dispute Resolution in the United States District Court for the Western District of New York ("the ADR Plan").

FURTHER, that the parties shall re-engage with Mediator Michael Menard and participate in the mediation session scheduled for September 11, 2019 (Docket No. 76).

FURTHER, that within 10 days of the September 11, 2019 mediation session and any subsequent sessions, the mediator shall file a Mediation Certification setting forth the progress of mediation.

FURTHER, that the mediation process shall be completed by October 31, 2019.

FURTHER, that the parties shall timely comply with all relevant requirements of the ADR Plan, which is available at http://www.nywd.uscourts.gov.

FURTHER, that the parties shall appear before this Court on November 20, 2019, at 9:00 a.m. to report on the status of this case if it is not sooner resolved through mediation.

SO ORDERED.

Dated:   August 18, 2019
         Buffalo, New York

                                        /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                        United States District Judge